IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **THRIVENT FINANCIAL FOR LUTHERANS, and THRIVENT INVESTMENT MANAGEMENT, INC.,**<br><br>Plaintiffs,<br><br>vs.<br><br>**MICHAEL C. HUTCHINSON,**<br><br>Defendant. | **CASE NO. 8:12CV380**<br><br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on the Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction (Filing No. 2). Having considered the parties' briefs, evidence, and arguments heard on November 2, 2012, the Court will grant the Plaintiffs' Application, in part.

## PROCEDURAL HISTORY

Thrivent filed its Complaint (Filing No. 1) and Application for Temporary Restraining Order and Preliminary Injunction on October 25, 2012. Thrivent asserts two causes of action against Hutchinson: (1) breach of contract, and (2) violation of Nebraska's Trade Secrets Act. Thrivent alleges that Hutchinson wrongfully solicited Thrivent's clients and misappropriated confidential information. Thrivent seeks to enjoin Hutchinson from (1) using or disclosing its confidential information; (2) for a one-year period, soliciting Thrivent clients with whom Hutchinson had direct contact and for whom he had access to Thrivent's Confidential Business information during the two years before August 30, 2012; and (3) otherwise violating his contractual agreements with, and statutory duties owed to, Thrivent.

Thrivent notes that one of two contracts it entered into with Hutchinson contains a mandatory arbitration provision (Filing No. 1-2) and, therefore, it commenced an arbitration claim with the Financial Industry Regulatory Authority ("FINRA") concurrently with this action. The parties acknowledge that, from a substantive perspective, FINRA will hear the issues currently before the Court; and, if a temporary restraining order ("TRO") is granted, FINRA will expedite its hearing.

## FACTUAL BACKGROUND

Plaintiffs Thrivent Financial for Lutherans ("Thrivent Financial") and Thrivent Investment Management, Inc. ("Thrivent Investment") (collectively, "Thrivent") offer financial protection planning products and services to customers through Financial Associates. Defendant Michael C. Hutchinson is a Nebraska resident, and a registered representative and securities broker registered with FINRA.

From 2006 until August 28, 2012, Hutchinson was a Financial Associate affiliated with Thrivent on an independent contractor basis. In order to become affiliated with Thrivent, Hutchinson was required to sign two contracts: (1) the Financial Associate Agreement ("FAA") entered into with Thrivent Financial (Filing No. 1-1), and (2) a Registered Representative Agreement ("RRA") entered into with Thrivent Investment (Filing No. 1-2). Those two contracts each have a provision titled "CONFIDENTIAL INFORMATION," and a provision titled "PRESERVATION OF BUSINESS." (*See* Filing No. 1-1 at CM/ECF p. 5; Filing No. 1-2, at CM/ECF p. 5.)

The provision titled "CONFIDENTIAL INFORMATION" states:

[Hutchinson] agrees that, while this Agreement is in effect and for a period of one (1) year immediately following termination of this Agreement, [Hutchinson] will not directly or indirectly use or disclose any Confidential Business Information. [Hutchinson] agrees that his . . . obligations under

2

>this subsection will apply equally to Confidential Business Information that is in the Society's possession and that may be discovered or developed by [Hutchinson], whether [Hutchinson] has any such Confidential Business Information recorded in written, electronic or other form. "Confidential Business Information" means all information that is not readily available to or generally ascertainable by the public, and that has limited disclosure within the Society or that is treated or designated as Confidential Business Information by the Society, the disclosure of which would be harmful to the interests of the Society.

(*See id.* ¶ IV. A.)  The provision titled "PRESERVATION OF BUSINESS" states:

>[Hutchinson] agrees that, while this Agreement is in effect and for a period of one (1) year immediately following termination of this Agreement, [Hutchinson] will not engage in solicitation, or take any other action, that would cause or attempt to cause or influence a Restricted Society Client to terminate, replace, surrender or cancel any Society Product. . . . A "Restricted Society Client" is the owner or recipient of a Society Product for whom [Hutchinson] had access to the Society's Confidential Business Information about such client, during the two (2) year period immediately preceding termination of this Agreement.

(*See id.* ¶ IV. B.)

Hutchinson contends that he "had access" to many of Thrivent's clients with whom he never had personal contact. Thrivent points to Thrivent's privacy policy and security-of-customer-information policy, that indicates it uses "physical, technical and administrative safeguards . . . to protect" its confidential information, and that its confidential information is maintained on a "need to know basis." (Filing No. 21-3 at CM/ECF p. 2.) Under those policies, someone "need[s] to know" confidential information if the information is "necessary to perform the duties of [his or her] job." (*Id.* at 5.) The person in control of the confidential information is "responsible for ascertaining the 'need to know' before sharing it with another . . ." (*Id.*) Therefore, Thrivent contends that it had policies in place to ensure that Hutchinson, and others, did

3

not have access to Thrivent's Confidential Business Information with respect to a Thrivent client unless they did business with that client.

On or about August 28, 2012, Thrivent received a letter from Hutchinson indicating he was terminating his affiliation with Thrivent and accepting a position with another company, which turned out to be New York Life, one of Thrivent's competitors. Although Hutchinson changed his affiliations, he used the same office and telephone number as he did when he was affiliated with Thrivent.  Thrivent alleges it subsequently discovered Hutchinson had sent a letter to at least one of his Thrivent clients the day prior to announcing his resignation.  (*See* Filing No. 1-6.)  That letter states:

> I would like to take this opportunity to personally thank you for allowing me to serve you as your financial representative, and have enjoyed our working relationship over the years.
>
> To continue to better serve you and offer the quality, professional service you desire as my valued client, I am changing my affiliation to New York Life.  By doing so, I will be able to provide products and services not currently available to you through Thrivent Financial.
>
> Due to my contractual agreement with Thrivent Financial, I will not be able to contact you regarding your Thrivent Financial products once I change affiliations.  My office will be in the same location and my phone number will remain the same.  If you need assistance with your financial planning or have questions about your financial products, please feel free to stop by the office or give me a call.
>
> I am here to help you, and look forward to serving you and your family in the future.

(*Id.*)  Thrivent contends this letter is evidence that Hutchinson solicited Thrivent clients to move with him to New York Life.  Hutchinson alleges he was merely attempting to inform his clients that he was changing his affiliation to New York Life.

Thrivent continued to investigate Hutchinson's purported solicitation activities, and alleges that it discovered Hutchinson had, two months prior to sending his

4

resignation letter to Thrivent, started a scheme to take his Thrivent clients with him to New York Life. Thrivent alleges that two months prior to sending his resignation letter to Thrivent, he registered with the Nebraska Department of Insurance as a New York Life representative (Filing No. 1-5), and began transferring his clients to Thrivent's Financial Advice Center ("FAC") without a legitimate business reason for doing so.

The FAC is a service center for Thrivent customers who do not have a specific Financial Associate assigned to their files. Thrivent notes that the FAC is used for low-asset clients who do not need the individual attention of a specific Financial Associate. When a Financial Associate terminates his or her relationship with Thrivent, Thrivent's ordinary practice is to reassign his or her clients to others within the office, not to the FAC. Thrivent alleges that Hutchinson transferred many of his clients, even those with sufficient assets to require the individual attention of a Financial Associate, to the FAC because it made it harder for Thrivent to detect his solicitation activities; and the transferred clients would not form a one-on-one relationship with a new Thrivent Financial Associate. Thrivent contends, therefore, that Hutchinson would not have direct competition with another Financial Associate when he tried to take those clients with him to New York Life.

Hutchinson claims that beginning in or around January 2012, Thrivent directed him to reduce the number of clients he serviced to about 125 clients for the stated purpose of assisting with the implementation of a new revenue model for all Thrivent representatives.[1] Hutchinson alleges the real purpose of that direction was to allow

---

[1] *See* Filing No. 20-2 (email from Ken Kolosso, managing partner for Thrivent's Nebraska office):

**It is important to ensure reassignments to the Financial Advice Center or those going from standard assigned to 'temp' assigned be completed and sent to Shirley**

5

Thrivent to use the pool of clients he and other senior Financial Associates gave up to recruit new Financial Associates to join Thrivent.  Hutchinson alleges that transferring clients to the FAC was how Thrivent intended to create that pool of clients, and that Hutchinson was merely complying with his supervisor's directives when he transferred some of his clients to the FAC.  Thrivent claims that the new revenue model Hutchinson references called for Financial Associates to analyze their clients to determine if any of the clients were low-asset clients and, therefore, should be transferred to the FAC.

Thrivent also alleges that, after terminating his affiliation with Thrivent, Hutchinson failed immediately to return all of Thrivent's property despite certifying that he had returned all of Thrivent's property.  (Filing No. 1-4.)  Thrivent acknowledges that Hutchinson returned certain files to Thrivent on October 23, 2012, and October 31, 2012, but states that it cannot be certain Hutchinson has returned all Thrivent's property because when he has returned some of Thrivent's property he has falsely represented that he returned all that he had in his possession.

Hutchinson alleged that upon his disassociation with Thrivent, he returned all Thrivent's property except for certain compliance files.  He represented that he retained those files because he did not believe they contained Confidential Business Information and because he believed he needed to maintain the information contained in those files for seven years to comply with certain record-keeping rules.  Thrivent contends that the record keeping requirements concerning those files apply to Thrivent and, therefore,

---

**Alther by Friday, September 14th.**  This will allow time for Shirley to enter all the reassignments into the system by the deadline of September 30th.  Be sure to leverage Curt, Jeff, Ken, and me as you work to manage you book to leverage the new revenue model.

*See also* Filing No. 20-3.

6

those requirements imposed an obligation on Thrivent, not Hutchinson. Hutchinson does not now dispute this contention.

## STANDARD

Courts in the Eighth Circuit apply the factors set forth in *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc), when determining whether to issue a TRO. *See S.B. McLaughlin & Co., Ltd. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989) (approving the use of *Dataphase* factors for analyzing a TRO motion). Those factors are: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase*, 640 F.2d at 114. "No single factor is determinative." *WWP, Inc. v. Wounded Warriors, Inc.*, 566 F. Supp. 2d 970, 974 (D. Neb. 2008). The movant bears the burden of establishing the propriety of the TRO. *See Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011).

## DISCUSSION

### I. Likelihood of Success on the Merits[2]

#### A. Breach of Contract Claim

To succeed on its breach of contract claim, Thrivent must prove "(1) the existence of a contract; (2) breach of the contract; and (3) damages which flow from the breach." *Remedial Const. Services, Inc. v. Gen. Concrete, Inc.*, No. 8:02CV8, 2002 WL 31011069, at *1 (D. Neb. Sept. 6, 2002) (citing *United States v. Basin Elec. Pwr. Coop.*, 248 F.3d 781, 810 (8th Cir.2001)); *see also Henriksen v. Gleason*, 643 N.W.2d 652, 658 (Neb. 2002) (citing *Phipps v. Skyview Farms*, 610 NW.2d 723 (Neb. 2000)) ("In order to

---

[2] The parties agree that Nebraska law governs their dispute.

7

recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty.").

The parties' dispute focuses on the enforceability of the contracts' non-solicitation provisions. Thrivent argues that the non-solicitation provisions are valid because their coverage is limited to a specific category of clients, it will not deprive the public of financial services, and it is necessary to protect Thrivent's legitimate business interest in its Confidential Business Information. Hutchinson contends the non-solicitation provisions are void because they restrict him from working for or soliciting a Thrivent client even if he did not actually do business with or have personal contact with the client. He also asserts the contracts are injurious to the public because they reduce marketplace competition, which is generally favored for customers and protected under the law. Finally Hutchinson argues that the contracts are unduly harsh and oppressive because Thrivent drafted the contracts and he could not be a Thrivent representative without signing them as drafted.

"Regardless of the context, a partial restraint of trade such as a covenant not to compete must meet three general requirements to be valid." *H & R Block Tax Servs., Inc. v. Circle A Enters., Inc.*, 693 N.W.2d 548, 553-54 (Neb. 2005). Those three requirements are: (1) "it is not injurious to the public"; (2) "it is no greater than reasonably necessary to protect the employer in some legitimate business interest"; and (3) "it is not unduly harsh and oppressive on the party against whom it is asserted." *Id.* (citing *Polly v. Ray D. Hilderman & Co.,* 407 N.W.2d 751 (Neb. 1987); *Presto-X-Company v. Beller,* 568 N.W.2d 235 (Neb. 1997)).

### 1. Not Injurious to the Public

Thrivent argues that the non-solicitation provisions are not injurious to the public because the provisions will not cause the public to be deprived of financial services. That is to say, only a specific category of Thrivent clients are affected by the non-solicitation provisions. Hutchinson contends that the non-solicitation provisions are injurious to the public because they impose a limit on marketplace competition, and marketplace competition is favored for customers.[3]

The record does not demonstrate that enforcement of the non-solicitation provisions will be detrimental to the public. First, nothing indicates Thrivent clients covered by the non-solicitation provisions do not have access to many other financial service firms to obtain financial services.[4] Second, the Court agrees that the non-

---

[3] *But see Boisen v. Petersen Flying Serv., Inc.*, 383 N.W.2d 29, 33 (Neb. 1986) (internal quotation marks omitted) ("A restraint on the employee is illegal when its purpose is the prevention of competition, except when the methods of competition to be prevented are methods commonly regarded as improper and unfair.").

[4] *Chambers-Dobson, Inc. v. Squier*, 472 N.W.2d 391, 401-02 (Neb. 1991) (internal citations omitted):

> In *Dow,* the court concluded that a beautician's promise not to compete with her former employer was not injurious to the public, since the area of noncompetition was the city of Grand Island, which "had beauty parlors a plenty, a number of them."
>
> In Squier's case, each of the noncompetition covenants involves a very specific category of customers. First, the covenant in the sale agreement relates only to previous customers of the Squier–McCashland Agency, individuals wherever they may be located, but who have been identified on the customer list included in the sale to Chambers–Dobson. This category of customer exists unrelated to Squier's employment with Chambers–Dobson. Second, the covenant in Squier's employment contract relates only to persons who have been Chambers–Dobson's customers during Squier's employment with Chambers–Dobson, wherever those customers may live. Consequently, in reference to potential insurance customers, the covenants relate not to the public in general, but to very specific and limited groups of potential customers denied to Squier by the covenants. As far as an actual number is concerned, the prohibited customer pool consisted of 20 former customers of the Squier–McCashland Agency and 19 Chambers–Dobson customers. We take note that if the populace of the city of Lincoln and Lancaster County has been correctly counted by the U.S. Bureau of the Census for the 1980 census, Lincoln included 171,932 people, while Lancaster County included 192,884 persons. Although the noncompetition covenants are not restricted to Lincoln and

solicitation provisions will only affect a limited segment of the public. They will only affect, for a one-year period, the Thrivent clients for whom Hutchinson had access to Thrivent's Confidential Business Information during the two years before disassociating with Thrivent and with whom he actually did business. Finally, the non-solicitation provisions do not prohibit Hutchinson from working with Thrivent clients even if he did have access to their confidential information and did business with them. The provisions only prohibit him from *soliciting* their business. They do not prohibit him from working with clients who unilaterally contact Hutchinson and decide to do business with him. Therefore, the Court finds that the non-solicitation provisions are not injurious to the public.

### 2. No Greater than Reasonably Necessary to Protect a Legitimate Interest

The parties do not dispute that an employer's interest in its goodwill is a legitimate business interest.[5] Rather, they dispute whether the non-solicitation provisions are "no greater than reasonably necessary" to protect that legitimate business interest.

A covenant not to compete in the employment context is "no greater than reasonably necessary" to protect an employer's legitimate business interest "'only if it restricts the former employee from working for or soliciting the former employer's clients

---

Lancaster County, nonetheless, it is inconceivable that the aggregate number of persons comprising the potential customer pools denied to Squier by the covenants is large enough to justify the conclusion that an appreciable number of the public would be denied access to Squier as their insurance agent. Under the circumstances, the noncompetition covenants do not violate Nebraska public policy.

[5] *See Boisen*, 383 N.W.2d 33 (internal quotation marks omitted) ("An employer [also] has a legitimate business interest in protection against competition by improper and unfair methods.").

or accounts with whom the former employee actually did business and ha[d] personal contact.'" *H & R Block*, 693 N.W.2d at 554 (quoting *Polly*, 407 N.W.2d at 756).[6]

The reason that the scope of a non-solicitation provision must be limited to clients with whom the former employee actually did business and had personal contact is that courts try to protect an employer "against competition by improper and unfair methods," but will not protect an employer "from ordinary competition." *Boisen*, 383 N.W.2d at 33 (internal quotation marks omitted). The focus is "on an employee's opportunity to appropriate the employer's goodwill by initiating personal contacts with the employer's customers" when a court tries "[t]o distinguish between 'ordinary competition' and 'unfair competition.'" *Id.* This is because personal contact with an employer's customers allows the employee to "develop[ ] goodwill with [those] customers, and siphon[ ] away the goodwill under circumstances where the goodwill properly belongs to the employer." *Id.*

Although the language of the non-solicitation provisions indicates Hutchinson is prohibited from soliciting a client if he "had access" to Thrivent's Confidential Business Information relating to that client even if he did not do any business with the client, Thrivent had in place policies that made it so that Hutchinson would not "ha[ve] access" to Thrivent's Confidential Business Information unless needed to do his job. Therefore,

---

[6] In the context of the sale of a business,

> [T]he restraint of trade that is permissible ... is no greater than is necessary to attain the desired purpose-the purpose of making good will a transferable asset. It is lawful for the seller to restrict his own freedom of trade only so far as is necessary to protect the buyer in the enjoyment of the good will for which he pays. The restraint on his own freedom must be reasonable in character and in extent of space and time.

*H & R Block*, 693 N.W.2d at 554 (alteration in original) (internal quotation marks omitted) (quoting *Presto-X-Company*, 568 N.W.2d at 239).

there is no reason to believe that Hutchinson "had access" to confidential information relating to Thrivent clients with whom he did not actually do business because that information would not have been needed by him to do his job.

The only evidence to which either party has pointed that indicates Hutchinson had "access" to Confidential Business Information for Thrivent clients for whom he may not have done work, and with whom he may not have had personal contact, relates to clients assigned to two Assistant Financial Associates. (Filing No. 21 at ¶ 11.) The record indicates, however, that Hutchinson's contact with those clients may have been sufficiently close that he developed goodwill with those clients that properly belongs to Thrivent;[7] those Assistant Financial Associates acted as subcontractors for Hutchinson and split their commissions with Hutchinson while Hutchinson acted as their "Team Leader." (Filing No. 21 at ¶¶ 11-13.) Therefore, the Court finds Thrivent is likely to succeed on its claim that the non-solicitation provisions are valid.

### 3. Not Unduly Harsh and Oppressive

The Nebraska Supreme Court uses a balancing test to determine if a covenant not to compete is "unduly harsh and oppressive." *Am. Sec. Servs., Inc. v. Vodra*, 385 N.W.2d 73, 80 (Neb. 1986). Under that test, "a court must balance harshness and oppressiveness on the covenantor employee against protection of the covenantee employer's valid business interest." *Chambers-Dobson*, 472 N.W.2d at 400. The factors a court may consider include:

> [1] the degree of inequality in bargaining power; [2] the risk of the covenantee losing customers; [3] the extent of respective participation by the parties in securing and retaining customers; [4] the good faith of the covenantee; [5] the existence of sources or general knowledge pertaining to the identity of customers; [6] the nature and extent of the business

---

[7] *See Boisen*, 383 N.W.2d at 33, 34.

12

>position held by the covenantor; [7] the covenantor's training, health, education, and needs of his family; [8] the current conditions of employment; [9] the necessity of the covenantor changing his calling or residence; and [10] the correspondence of the restraint with the need for protecting the legitimate interests of the covenantee.

*Vodra*, 385 N.W.2d at 80 (quoting *Philip G. Johnson & Co. v. Salmen*, 317 N.W.2d 900, 904 (Neb. 1982)). There is, however, "no arithmetical computation or formula required in a court's consideration of the factors involved or to be considered." *Chambers-Dobson*, 472 N.W.2d at 400. They "are not weighted; that is, there is no prescribed method by which more or less weight is assigned to each factor to be considered in the balancing test . . ." *Id.*

The Court finds that the non-solicitation provisions are not "unduly harsh and oppressive." Even if Hutchinson may not have been able to negotiate the terms of the FAA and RRA if he wanted to be affiliated with Thrivent, the non-solicitation provisions help protect Thrivent's legitimate interest in its goodwill and they do not require Hutchinson to change his calling or residence. Keeping in mind Thrivent's privacy and security-of-customer-information policies, the non-solicitation provisions are narrowly tailored to cover only those clients for whom Hutchinson had access to Thrivent's Confidential Business Information and with whom Hutchinson actually did business. There is no reason to believe the number of other potential clients outside the scope of the non-solicitation provisions with whom Hutchinson could pursue business opportunities is significantly limited. Further, the non-solicitation provisions do not prohibit Hutchinson from doing business with clients within the scope of the non-solicitation provisions so long as Hutchinson does not initiate contact with those clients.

13

Thrivent has presented evidence demonstrating that Hutchinson likely breached the non-solicitation provisions, and Hutchinson does not dispute that Thrivent would suffer damages resulting from a breach of those non-solicitation provisions. Therefore, Thrivent has satisfied its burden of showing a likelihood of success on the merits with respect to its breach of contract claim.

### B. Misappropriation of Trade Secrets Claim

To succeed on his misappropriation of trade secrets claim, Thrivent must prove:

> (1) the existence of a trade secret . . . , (2) the value and importance of the trade secret to [Thrivent] in the conduct of [its] business, (3) [Thrivent]'s right by reason of discovery or ownership to the use and enjoyment of the secret, and (4) the communication of the secret to [Hutchinson] while he was employed in a position of trust and confidence and under circumstances making it inequitable and unjust for him to disclose it to others or to use it himself to the employer's prejudice.

*Softchoice Corp. v. MacKenzie*, 636 F. Supp. 2d 927, 936-37 (D. Neb. 2009) (citing *Richdale Dev. Co. v. McNeil Co.,* 508 N.W.2d 853 (Neb. 1993)).

The Nebraska Trade Secrets Act defines a "trade secret" as:

> information . . . that:
>
> (a) Derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Neb. Rev. Stat. § 87-502(4). Generally, "[c]ourts are reluctant to protect customer lists to the extent that they embody information that is readily ascertainable through public sources." *Home Pride Foods, Inc. v. Johnson*, 634 N.W.2d 774, 782 (Neb. 2001). However, "where time and effort have been expended to identify particular customers with particular needs or characteristics, courts will prohibit others from using this

14

information to capture a share of the market" because "[s]uch lists are distinguishable from mere identities and locations of customers that anyone could easily identify as possible customers." *Id.*

Thrivent has satisfied its burden of showing the existence of a trade secret. Hutchinson does not dispute that Thrivent's Confidential Business Information consists of information such as client lists, information disclosed by clients to Thrivent, customer files, and information regarding client assets and investments. Thrivent also has pointed to evidence indicating that it puts forth reasonable efforts to maintain the secrecy of that information. (*See* Filing No. 21-3.)

Further, there is reason to believe that Thrivent's Confidential Business Information is valuable and important to Thrivent's business. Thrivent has in place policies designed to ensure the secrecy of its Confidential Business Information, and it requires those who want to become affiliated with Thrivent to sign contracts in which they agree to maintain the secrecy of that information and return it to Thrivent in the event that they terminate their affiliation with Thrivent. Here specifically, the parties agreed in writing that Hutchinson would not disclose Thrivent's Confidential Business Information, regardless of whether Hutchinson discovered or developed the information composing Thrivent's Confidential Business Information, in order to prevent the information from being disclosed or used by Thrivent's competitors. (*see* Filing No. 1-1 at CM/ECF p. 5 ¶ IV. A.)

With respect to the third element of Hutchinson's misappropriation of trade secrets claim, Hutchinson does not dispute that he agreed in writing that Thrivent owned its Confidential Business Information. (*See* Filing No. 1-1, at CM/ECF p. 4 ¶ D.)

Finally, under the circumstances presented here, it would be inequitable for Hutchinson to disclose or communicate Thrivent's Confidential Business Information to others or to use it solely for his own benefit. Hutchinson agreed in writing that, even if he discovered or developed the information, Thrivent owned the Confidential Business Information and that, upon the termination of his affiliation with Thrivent, he would return that information to Thrivent and would not use it or disclose it to others for a one-year period.[8] Therefore, Thrivent has met its burden of showing a likelihood of success on the merits with respect to its misappropriation of trade secrets claim.

## II. Threat of Irreparable Harm

Thrivent contends that there is a threat of irreparable harm because Hutchinson is threatening its goodwill and reputation by continuing to breach his contractual obligations and continuing to misappropriate its Confidential Business Information. Hutchinson argues that Thrivent has not met its burden of proving irreparable harm because it alleges only the possibility of economic harm, and "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Although Thrivent may seek economic damages, under the present circumstances, the amount of damages resulting from the solicitation of Thrivent's clients and use of its Confidential Business information would be difficult, if not

---

[8] *See* Neb. Rev. Stat. § 87-502(2)(b)(ii)(C):

Misappropriation shall mean . . . [d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use[.]

16

impossible, to ascertain with any degree of certainty. Therefore, the Court finds that Thrivent has satisfied its burden of showing a threat of irreparable harm. *See Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (internal quotation marks omitted) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury. . . . Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars."); *see also Am. Express Fin. Advisors, Inc. v. Yantis*, 358 F. Supp. 2d 818, 835 (N.D. Iowa 2005) (internal quotation marks omitted) ("The courts of a number of states have held that the mere violation of a valid covenant not to compete supports an inference of the existence of the threat of irreparable harm. . . . The Eighth Circuit Court of Appeals has employed this approach without concern of any particular state's laws.").

### III.  Balance of Hardships

Thrivent contends that the equities weigh in favor of an injunction because Hutchinson's activities threaten irreparable harm to Thrivent, whereas, an injunction would not impose an undue burden on Hutchinson because he could continue to work in the same industry and could still seek client relationships with a vast potential customer base; he merely could not solicit the specific clients covered by the non-solicitation provisions. Hutchinson argues, again, that the non-solicitation provisions are overbroad and would prohibit him from contacting clients even if he did not have any personal contact with those clients when he worked for Thrivent and, therefore, that the non-solicitation provisions would have a chilling effect on his business.

The Court finds that, on balance, the equities weigh in favor of an injunction. As previously stated, whereas the non-solicitation provisions do not prohibit Hutchinson

17

from seeking client relationships from people with whom he did not do business, there is a threat of irreparable harm to Thrivent if an injunction is not granted. Further, the non-solicitation provisions do not prohibit Hutchinson from servicing his former Thrivent clients as a New York Life representative as long as he is not the one who initiates the contact with the client.

## IV. Public Interest

Hutchinson argues that granting an injunction would not serve the public interest because it might prohibit him from providing needed services to the many people who have entrusted their money and retirement funds with him. Hutchinson argues that he would not be able to provide objective advice to those customers with whom he has built significant, trusting relationships, because he could not advise those people to obtain a new product over a Thrivent product even if the new product would provide a higher return than the Thrivent product for fear that it might result in a violation of the injunction. As explained previously, that is not the case. As long as he does not initiate contact with his former Thrivent clients and otherwise complies with the terms of the non-solicitation provisions, he may provide anyone his objective advice. Therefore, the Court finds enforcing the non-solicitation provisions in this case would serve the public interest.[9]

---

[9] *Merry Maids, L.P. v. WWJD Enters., Inc.*, No. 8:06CV36, 2006 WL 1720487, AT *11 (D. Neb. June 20, 2006):

> The enforcement of a reasonable covenant not to compete serves to confirm the legitimate expectations of business people who enter into franchise agreements. "It is important to the rational conduct of commerce that expectations expressed in written agreements be enforced unless there is a very good reason not to do so."

**CONCLUSION**

Based on an analysis of the *Dataphase* factors, the Court finds that a TRO is necessary to preserve the status quo, at least pending the resolution of the expedited arbitration hearing to be held before FINRA. Accordingly,

IT IS ORDERED that the Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction (Filing No. 2) is granted in part, as follows:

1. Defendant Michael C. Hutchinson, his agents, employees, and all those acting in concert with him, are restrained and enjoined from:

    a. Retaining possession of any of Plaintiffs' documents, records, or other property, including its Confidential Business Information (as defined in the agreements entered into between Defendant Michael C. Hutchinson and the Plaintiffs (*see* Filing Nos. 1-1 & 1-2)) or depriving Plaintiffs of the possession of such documents, records, or other property;

    b. Until September 7, 2013, or further order of this Court, directly or indirectly initiating contact with his former clients with whom he did business and for whom, in accordance with Plaintiffs' customer privacy and security-of-customer-information policies, he had access to Plaintiffs' Confidential Business Information from September 7, 2010, to September 7, 2012;

2. This action is stayed pending an expedited arbitration hearing to be held before the Financial Industry Regulatory Authority regarding Plaintiff Thrivent Investment Management Inc.'s request for permanent injunctive relief; and

3. The parties shall notify the Court of the results of the expedited arbitration hearing to be held before the Financial Industry Regulatory regarding Plaintiff Thrivent Investment Management Inc.'s request for permanent injunctive relief.

Dated this 6th day of November, 2012.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge